Jiakun Lei (Cal. Bar. No. 299,684)
CDLP LAW
135 South State College Blvd., Suite 200
Brea, CA, 92821
Telephone: (626) 671-7000
Facsimile: (877) 552-3816
E-Mail: jlei@cacdlp.com
Attorney for Plaintiff Emilio Reyes

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

|  |  |
|---|---|
| EMILIO REYES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; AMY DUTSCHKE in her official capacity as Regional Director of the Bureau of Indian Affairs Pacific Regional Office, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 5:18-cv-02128-GW-AGR<br><br>**PLAINTIFF EMILIO REYES'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: November 22, 2021<br>Time: 8:30 AM |

**PLEASE TAKE NOTICE** that Plaintiff Emilio Reyes (Plaintiff), on November 22, 2021, at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable George H. Wu, in the District Court for the Central District of California, in Courtroom 9D, 9th Floor, will and hereby does move for summary judgment, pursuant to Federal Rules of Civil Procedure 56(c), on Plaintiff's claims presented in this case. Pursuant to the Parties' Joint Scheduling Report, ECF No. 136, the Court has entered the following briefing schedule: the parties' cross-opening briefs shall be due on November 1, 2021; the parties' cross-reply briefs shall be due on November 9, 2016. ECF No. 137.

This motion is based upon all pleadings filed to date in the above-captioned

1     civil action as well as the attached Memorandum of Law and exhibits attached

2     thereto, filed herewith.

3

4                                   Respectfully submitted,

5

6 Date:  November 1, 2021        */s/ Jiakun Lei*

7                                     Jiakun Lei, CDLP LAW

                                    Attorney for Plaintiff Emilio Reyes

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.   INTRODUCTION……………………………………………………………… 1

II.  BACKGROUND OF THE CDIB PROGRAM ...............................................................4

III. STATEMENT OF FACTS AND AGENCY PROCEEDINGS. ...................................5

IV. ARGUMENT................................................................................................6

    A. Subject Matter Jurisdiction…………………………………………………..6

    B. Plaintiff Had Exhausted Administrative Remedies and This Case Is
       Ripe for Judicial Review ...............................................................7

    C.  Standard of Review. ..............................................................7

    D. The BIA's Decisions Were Arbitrary or Capricious ...........................................9

    E. This Court Shoulder Order the BIA to Issue a CDIB to Plaintiff. .....................13

V. CONCLUSION. .............................................................................14

i

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*Air Courier Conference v. Am. Postal Workers Union,*
   498 U.S. 517 (1991) ..........................................................................................6

*Amer. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) .......................................................................8, 9

*Bennett v. Spear,*
   520 U.S. 154 (1997) ..........................................................................................6

*Cal. Comties. Against Toxics v. U.S. E.P.A.,*
   688 F.3d 989 (9th Cir. 2012) ............................................................................15

*Califano v. Sanders,*
   430 U.S. 99 (1977) ...........................................................................................6

*Darby v. Cisneros,*
   509 U.S. 137 (1993) ..........................................................................................7

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ..........................................................................................10

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ..........................................................................................9

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
   478 U.S. 221 (1986) ..........................................................................................6

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma,*
   962 F. Supp. 2d 1230 (D. Or. 2013) .................................................................7

*McCrary v. Gutierrez,*
   495 F. Supp. 2d 1038 (N.D. Cal. 2007) ...........................................................8

*Md. Dep't of Human Res. v. Dep't of Health & Human Servs.,*
   763 F.2d 1441 (D.C.Cir.1985) .........................................................................6

*Michigan v. EPA,*
   576 U.S. 743 (2015) ..........................................................................................9

ii

*National Urban League v. Ross*,
    489 F.Supp.3d 939 (N.D.Cal., 2020) ........................................................... 9

*Occidental Eng'g Co. v. INS*,
    753 F.2d 766 (9th Cir.1985). ....................................................................... 8

*Pollinator Stewardship Council v. U.S. E.P.A.*,
    806 F.3d 520 (9th Cir. 2015). ..................................................................... 13

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
    819 F. Supp. 2d 1077 (E.D. Cal. 2011). ....................................................... 7

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) ................................................................ 8

*Stuttering Found. of Am. v. Springer*,
    498 F. Supp. 2d 203 (D.D.C. 2007) .............................................................. 8

Statutes

28 U.S.C. § 1331 ........................................................................................... 6, 7
*5 U.S.C. § 552(a)(1)(D)* ..................................................................................... 3
*5 U.S.C. § 706* .................................................................................... 8, 9, 13
5 U.S.C.A. § 704 ................................................................................................. 7
Act of May 18, 1928 (45 Stat., P. 602) ........................................................... 2,5

Other Authorities

*Morgan Underwood, Sr. v. Deputy Ass't Secretary-Indian Affairs (Operations)*,
    93 Interior Dec. 13  (Interior Board of Indian Appeals, 1986)………………..passim

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES ISO HIS MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. <u>INTRODUCTION</u>

Plaintiff Emilio Reyes (Plaintiff) is a descendant of the Gabrielino (Tongva) Tribe, an Indian tribe recognized by the state of California but not the federal government.

In February 2013, Plaintiff completed an application with defendant Bureau of Indian Affairs ("BIA"), requesting the BIA to issue a Certificate of Degree of Indian or Alaska Native Blood (CDIB) acknowledging his affiliation with the Gabrielino (Tongva) Tribe.

On February 21, 2013, the BIA determined that it could not issue a CDIB to Plaintiff, instead, it provided Plaintiff with a verification letter (Verification Letter) confirming his California Indian descent. A Verification Letter differs from a CDIB as no blood quantum is listed, instead, it confirms an applicant's affiliation with an Indian tribe that is not recognized by the federal government.

The Verification Letter Plaintiff received also concluded that Plaintiff is affiliated with the Diegueno (San Diego) Tribe, and not the Gabrielino (Tongva) Tribe as Plaintiff's application had requested.

After receiving the Verification Letter, Plaintiff disputed the BIA's determination and requested the BIA to change his tribal affiliation from Diegueno to Gabrielino.

The BIA refused to change of Plaintiff's tribal affiliation and this lawsuit ensued.

The BIA offered the following explanations to justify its decision:

(a)  It is the policy of the BIA that only lineal descendants from a member enrolled in a federally recognized Indian Tribe are entitled to receive CDIBs. Because Plaintiff never contended that he was a lineal descendant of an enrollee/member of a federally recognized tribe, the BIA was not required to issue him a CDIB.

(b)  Plaintiff's great-great grandmother Mary Bega was enrolled in the Roll of the Indians of California under the Act of May 18, 1928 (45 Stat., P. 602) (the "1928 Roll") as a member of the Diegueno tribe.  Since Mary Bega was the only lineal ancestor Plaintiff identified as an enrollee of the 1928 Roll, Plaintiff's tribal affiliation was fixed with the Diegueno tribe, as Mary Bega herself was.

For several reasons, the explanations offered by BIA were fatally flawed and the BIA acted capriciously and arbitrarily in refusing to issue a CDIB to Plaintiff recognizing his affiliation with the Gabrielino Tribe:

(a) The BIA had routinely issued to CDIBs to applicants who were not affiliated with any federally recognized tribe, including many of Plaintiff's own family members and relatives.[1]  The BIA also routinely accepted collateral ancestry as satisfactory proof for an applicant's tribal affiliation, and its insistence for proof of lineal ancestry in this case failed to comply with the procedural requirement set forth in the Administrative Procedure Act ("APA").

Interestingly, the BIA does not dispute that formal rule making under the APA is needed for its CDIB processing practices, including who may be eligible to receive a CDIB, the procedure and substantive requirements governing how the agency should issue, amend, or revoke a CDIB.  In fact, the BIA conceded that "[i]n the absence of regulations, the Bureau has been without the authority to invalidate or amend CDIBs issued in error[,]" *Proposed 25 CFR, Part 70*, 65 FR 20775[2], and formally proposed a rule that "will establish documentation requirements and standards for filing, processing, and issuing a Certificate of Degree of Indian or Alaska Native Blood (CDIB) by the Bureau of Indian Affairs (Bureau)." *Id*.  If adopted, the purported rule "will provide the policies and standards that will allow the Bureau to issue, amend, or invalidate CDIBs." *Id*.  Importantly, the proposed rule does require an applicant to prove *lineal ancestry* from a member enrolled in a *federally recognized Indian tribe*

---

[1] *See Declaration of Emilio Reyes,* filed under Seal.

[2] Bureau of Indian Affairs' proposed rule governing the issuance of CDIBs, published on 04/18/2000, 65 FR 20775. Available at https://www.federalregister.gov/documents/2000/04/18/00-9421/certificate-of-degree-of-indian-or-alaska-native-blood, lasted visited 10/30/2021.

1    to receive a CDIB.

2        However, the proposed rule was never formally adopted since the BIA had

3    never filed any final regulation to be published in the Federal Register as required by

4    the APA. *5 U.S.C. § 552(a)(1)(D)*

5        As such, the BIA seems to have relied on a void regulation (the proposed rule

6    that never becomes effective) or no regulation at all, to require proof of *lineal*

7    *ancestry* from a member of a *federally recognized tribe* in its CDIB adjudication

8    scheme.  These requirements belied the agency's normal practice of issuing CDIBs

9    to applicants who could only prove collateral ancestry to member(s) of non-federally

10   recognized tribes and are plainly in violation of the APA.

11       (b)  As the Administrative Record (AR) will show, the BIA erroneously

12   assigned "Diegueno" as Mary Bega's tribe, even though Mary Bega herself listed her

13   tribal affiliation as "'Unknown Tribe' Riverside, County" on her enrollment

14   application.  The BIA failed to explain how it transmuted Mary Bega's tribal

15   affiliation from "unknown" to a definite finding and assignment of "Diegueno." AR

16   at pp 1305; 2426-2432.

17       The BIA's assignment of Mary Bega to the Diegueno tribe is even more

18   perplexing considering the agency's concurrent finding that Mary Bega's brother

19   Guillermo Grijalva, and sister Aurelia Grijalva Orosco belonged to the Gabrielino

20   (Tongva) Tribe in the same 1928 approved Roll. AR at pp 0975-0980; 1067-72.

21        This lawsuit would have been totally unnecessary had the BIA allowed

22   Plaintiff to use collateral ancestry to prove his tribal affiliation with the Gabrielino

23   tribe by pointing to the *uncontroverted evidence* in the Administrative Record that

24   his great-great granduncle (Mary Bega's brother) and great-great grandaunt (Mary

25   Bega's sister) were both recognized by the agency as members of the Gabrielino

26   Tribe in the 1928 approved Roll.

27                    ***************

28                    ***************

                              3

## II. BACKGROUND OF THE CDIB PROGRAM

The historical background regarding the CDIB program is best summarized by the BIA itself in response to a litigation in 1986.

In a case before the Indian Affairs Appeal Board, the BIA stated: "There is no statute or regulation or fundamental constitutional law which requires the issuance of CDIBs. CDIBs are granted for the convenience of the government, solely at the Assistant Secretary's discretion, to facilitate its work in determining eligibility of persons for federal programs. There is no regulation or statute which requires the issuance of these certificates nor is there any statute or regulation which makes the eligibility for any benefits or programs dependent on the possession of such certificates." *Morgan Underwood, Sr. v. Deputy Ass't Secretary-Indian Affairs (Operations) (Morgan Underwood)*, 93 Interior Dec. 13, 19, 1986 I.D. LEXIS 3, *15-16, 14 IBIA 3, 13

"BIA has chosen to memorialize its genealogic research through the issuance of a CDIB showing its determination of a person's degree of Indian blood. This CDIB is accepted as proof in determining eligibility or ineligibility for services and benefits available to Indians. BIA's practice of issuing CDIBs is thus an integral part of the process by which legal rights and privileges of Indians arise." *Morgan Underwood*, 93 Interior Dec. at 20.

As *Morgan Underwood, supra,* made clear, there is no statute, regulation or constitutional provision regulating the CDIB program and the BIA issued CDIBs only "for the convenience of the government." *Id*. However, the *Morgan Underwood* board concluded that since "the rights and privileges of Indians are dependent on the proper issuance of CDIBs," the BIA must engage in formal rule making under the APA and to adopt written regulations in compliance with the APA. *Morgan Underwood, supra,* 93 Interior Dec. 13, 20.

In 2000, the BIA finally heeded to the advice of the *Morgan Underwood* board and conceded that it must follow the APA to adopt regulations regarding its CDIB

4

program.  On April 18, 2000, the BIA moved to publish a proposed rule in the Federal Register to "provide the policies and standards that will allow the Bureau to issue, amend, or invalidate CDIBs." *Proposed 25 CFR, Part 70*, 65 Federal Register 20775.  The BIA also adopted an application form to be used by applicants of CDIBs, ostensibly based on the proposed rule. AR at pp 2613-15.

The BIA now contends that Plaintiff's application for a CDIB is governed by the substantive rules set forth in the proposed rule as they were embodied in the application form. Exhibit "1"  The agency further contends that since Plaintiff did not, and could not identify and prove his relationship with any lineal ancestor who was enrolled in a federally recognized tribe, his APA claim fails.

As will be discussed in greater details below, the agency's contention fails because it never adopted the proposed rule as a regulation pursuant to the rule making process under the APA.  The regulatory framework governing the CDIB program today is still the same as it existed in 1986 when *Morgan Underwood, supra* was decided, namely, "[t]here is no statute or regulation or fundamental constitutional law which [regulating] the issuance of CDIBs." *Morgan Underwood, supra,* 93 Interior Dec. 19

**III. STATEMENT OF FACTS AND AGENCY PROCEEDINGS.**

Plaintiff had been working with the BIA since January 2, 2013, when his first request for a CDIB was received by the agency. AR at pp 0002-03.

On or about February 19, 2013, the agency received Plaintiff's completed application for a CDIB. AR at pp 0004-05. On February 21, 2013, the agency determined that a CDIB could not be issued, and it provided Plaintiff with a verification of his California Indian descent. A verification differs from a CDIB as no blood quantum is listed; instead, a verification confirms he has California Indian ancestry based on his relationship to an individual listed on the Roll of the Indians of California under the Act of May 18, 1928 (45 Stat., P. 602) and approved May 17, 1933. *Id*., at 0004.

In a letter dated April 4, 2013 sent to the BIA, Plaintiff disputed the Diegueno determination and requested a statement with the correct tribal affiliation with the Gabrielino Tribe. AR at pp 0007. The BIA responded by correspondence dated May 7, 2013, providing Plaintiff its rationale in determining Mary Bega's tribal affiliation. In addition, Plaintiff was informed that no change to Mary Bega's tribal affiliation could be issued because the Agency lacks the authority. *Id.*

From 2013 through 2018, Plaintiff had attempted to have the BIA to rectify its erroneous tribal affiliation determination at the agency level without success.  As a result, Plaintiff filed this action on 10/04/2018.  ECF No. 1.

## IV. ARGUMENT

### A. Subject Matter Jurisdiction.

The APA is not a jurisdiction-conferring statute; it does not directly grant subject matter jurisdiction to the federal courts. *See Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Air Courier Conference v. Am. Postal Workers Union*, 498 U.S. 517, 523 n. 3, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991).  Rather, the judicial review provisions of the APA provide a limited cause of action for parties adversely affected by agency action. *See Bennett v. Spear*, 520 U.S. 154, 175, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Md. Dep't of Human Res. v. Dep't of Health & Human Servs*., 763 F.2d 1441, 1445 n. 1 (D.C.Cir.1985) ("The Supreme Court has clearly indicated that the [APA] itself, although it does not create subject-matter jurisdiction, does supply a generic cause of action in favor of persons aggrieved by agency action.").

Although the APA does not directly grant jurisdiction, the federal question statute, 28 U.S.C. § 1331, "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate." *Califano*, 430 U.S. at 105; *see also Hill v. Norton*, 275 F.3d 98, 103 (D.C.Cir.2001) ("challenges brought under the APA fall within the reach of the general federal jurisdiction statute, 28 U.S.C. § 1331").

1    Since this action asks the Court to determine, *inter alia*, whether the BIA's

2    standardless CDIB program violated the APA and whether the agency acted

3    capaciously and arbitrarily in denying Plaintiff's application for a CDIB

4    acknowledging his affiliation with the Gabrielino (Tongva) Tribe, federal question is

5    present, and the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

6

7    **B. Plaintiff Had Exhausted Administrative Remedies and This Case Is Ripe For Judicial Review.**

8    Where the APA applies, exhaustion of administrative remedies is a prerequisite to

9    judicial review when expressly required by statute or when agency rule requires

10   appeal before review and administrative action is made inoperative pending that

11   review. *Darby v. Cisneros*, 509 U.S. 137 (1993); 5 U.S.C.A. § 704.

12   Here, the only administrative remedy available to Plaintiff is to "give a written

13   request for corrections and provide supporting documentation to the issuing officer

14   within 45 days," Exh. "1," and Plaintiff unquestionably fulfilled this requirement by

15   engaging the agency and supplementing the administrative Records for many years

16   before he filed this action.

17   The Administrative Record also clearly demonstrated that appeal to higher

18   administrative authorities within the Department of Interior has been proven futile.

19   As such, Plaintiff had exhausted administrative remedies and no further effort is

20   needed before judicial review is available.

21   **C.  Standard of Review.**

22    The standard of review in an APA case is different than the standard of review

23   typically applied when a court resolves a motion for summary judgment. *See*

24   *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or.

25   2013), *aff'd sub nom. KlamathSiskiyou Wildlands Ctr. v. Gerritsma*, 638 F. App'x

26   648 (9th Cir. 2016); *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,

27   819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011).  Under Federal Rule of Civil

28   Procedure 56(c), summary judgment is appropriate where "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In a case involving review of agency action under the APA, however, the district court's role is not to identify genuine disputes of material fact for tribal because no tribal is anticipated or would be appropriate in such a case. *Klamath Siskiyou Wildlands Ctr*., 962 F. Supp. 2d at 1233; *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) ("[T]he standard set forth in Rule 56(c) does not apply [in an APA case] because of the limited role of a court in reviewing the administrative record."); *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (judicial review of agency action under the APA limited to the administrative record).

Instead, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir.1985)).  In other words, "the district court acts like an appellate court, and the 'entire case' is 'a question of law.'" *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (quoting *Amer. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007).

Section 706 of the APA authorizes courts to (1) compel agency action unlawfully withheld or unreasonably delayed, and (2) set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *5 U.S.C. §§ 706(1)* and *(2)*. With very few exceptions, judicial review under the APA is restricted to the administrative record lodged by the agency.

The APA expressly directs that "the court shall review the whole record or

those parts of it cited by a party." *5 U.S.C. § 706*.  An agency's decision may be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 573 (9th Cir. 1998).

In reviewing an agency action, the court is permitted to go outside the administrative record for the limited purpose of background information. *See National Urban League v. Ross*, 489 F.Supp.3d 939 (N.D.Cal., 2020)

**D. The BIA's Decisions Were Arbitrary or Capricious**

1. The APA's Arbitrary-and-Capricious Standard

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). It requires agencies to engage in "reasoned decision-making," *Michigan v. EPA*, 576 U.S. 743, 750, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015) (internal quotation marks omitted) and directs that agency actions be "set aside" if they are "arbitrary" or "capricious," *5 U.S.C. § 706(2)(A)*.

"The scope of review under the 'arbitrary and capricious' standard is a [narrow one] and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made …... In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ……" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citations omitted).

As the *Motor Vehicles* court further explained: "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

In addition, "when an agency changes course..... it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S.Ct. 2117, 2126 (2016) (quoting *Fox Television*, 556 U.S. at 515, 129 S.Ct. 1800, "It would be arbitrary and capricious to ignore such matters." *Id.*, at 515, 129 S.Ct. 1800.)

2. The BIA Relied on A Void Regulation and Acted Capriciously.

The BIA prescribed a form for the application of CDIBs. Among other things, the form instructs an applicant[3]:

All portions of the Request for Certificate of Degree of Indian or Alaska Native Blood (CDIB) must be completed. You must show your relationship to an enrolled member(s) of a federally recognized Indian tribe, whether it is through your birth mother or birth father, or both. A federally recognized Indian tribe means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community which appears on the list of recognized tribes published in the Federal Register by the Secretary of the Interior (25 U.S.C. 5131).

The form does not cite any statute or regulation for the agency's authority to exclude evidence of an applicant's relationship with a collateral ancestor who was enrolled in a non-federally recognized tribe, despite the BIA itself conceded that "[i]n the absence of regulations, the Bureau has been without the authority to invalidate or amend CDIBs issued in error. As a result, there are individuals who do not receive services for which they may qualify and individuals who receive services for which they do not qualify." *Proposed 25 CFR, Part 70*, 65 FR 20775, at 20776. As a corollary of this concession, the BIA would also lack the authority to issue CDIBs "[i]n the absence of regulations." *Id.*

For whatever reason, despite the BIA's clear understanding that the CDIB program needs to be governed by regulations adopted pursuant to the formal rule

---

[3] See Exhibit "1."

making procedures, it never adopts the proposed regulations and the entire Proposed 25 CFR, Part 70 never becomes effective.  Nevertheless, ***the BIA still required Plaintiff to satisfy the substantive rules to receive a CDIB that itself failed to adopt***.

      3. The BIA Failed to Consider the Relevant Factors and To Articulate A Satisfactory Explanation for Its Action.

      The BIA also acted in an arbitrary and capacious manner because it failed to consider the following relevant factors in determining Plaintiff's tribal affiliation:

      (a) the Secretary of the Interior approved and recognized Mary Bega's nephews and nieces as Gabrielino Indians:

      1.  Louis P. Grijalva, AR at pp 1000; 1011

      2.  Isabel Chairez, AR at pp 1038; 1043

      Similarly, the BIA recognized Mary Bega's *direct* descendants as Gabrielino Indians:

      3.  Guadalupe, Custodia Aguilar, AR at pp 1093; 1096

      4.  Albert Arreola, AR at pp 1112; 1115

      5.  Earl Campio, AR 1413; 1416; 1421

      (b) The BIA has relied on the Act of 1928, Act of 1948, and Act of 1968 to issue CDIB's to Plaintiff's collateral ancestors and relatives. For example:

      6.  Edward Trinie Grijalva, AR at p 1025

      7.  Angeline (Grijalva) Abrego, AR at p 1317

      8.  William Orosco, AR at p 1357

      9.  Earl Campio, AR at p 1424

The BIA has recognized Mary Bega *direct* descendant as Gabrielino Indian:

      10.  Pauline Rodriguez, AR at p 1126

The BIA has issued CDIB's based on collateral relationships:

      11.  Concepcion (Bega) Aguilar, AR at p 0543 (tribe is incorrect).

      12.  Marie (Reyes) Cabral, AR at p 0950 (tribe is incorrect).

      (c)  On February 7, 1938, the California State Relief Administration sent a letter to the Mission Indian Agency of the BIA regarding Mary Bega. The

11

correspondence states: "From our case history we learn that the *Bega family* has inhabited the Temescal Valley since 1819 and claims to be *full blooded Indians of the Shoshone [Gabrielino] tribe*." (Emphasis added). AR at pp 1492; 1510-1517; 1520-1525; 1529.

(d)  On November 4, 1965, the Office of the Solicitor ("SOL") for the Department of the Interior, *recognized* that *Aurelia Grijalva was a Gabrielino Indian*. AR at pp. 1545-1546. Aurelia died on October 3, 1945. AR at p 1082. Because Aurelia was a member of the San Pasqual Band of Mission Indians ("San Pasqual) and her children sought enrollment in San Pasqual, the SOL authorized to *change the tribal affiliation* of Aurelia (long after she died) so that her children would meet the requirements for enrollment in San Pasqual. AR at pp. 1545-1546.

(e) It is undisputed that Plaintiff is a direct descendant of Mary Bega and that Guillermo Grijalva and Aurelia Grijalva Orosco are full brothers of Mary Bega, making Guillermo and Aurelia collateral ancestors of Plaintiff. AR at p. 2612. The only reason given by BIA for refusing to change Plaintiff's tribal affiliation from Diegueno to Gabrielino is because the Secretary of the Interior determined Mary Bega was a Diegueno Indian, and BIA does not have the legal authority to change *Mary Bega's identity as a Diegueno Indian.* AR at 1305

This reason given by BIA's is fatally flawed for two reasons:

(i)  Plaintiff is not asking the BIA to change *Mary Bega's tribal affiliation;* he is only demanding the agency to change *his own tribal affiliation determination*. As the *Morgan Underwood* case, supra, correctly put, "[w]hile there is legislation which provides that the blood degree of persons named on the final rolls of [certain] Tribes cannot be changed, there is no authority of law which prevents the correction of blood degree for descendants of final enrollees where error has been established." *Morgan Underwood*, 93 Interior Dec. at pp 15-16.

The logic applies with equal force here: The BIA may or may not be without authority to change *Mary Bega's tribal affiliation because that was a done deal,* but was no statute or regulation that forbids the BIA to reconsider its own decision with

12

respect to *Plaintiff's tribal affiliation.*   The BIA failed to consider *uncontroverted evidence* of Plaintiff's collateral ancestry from Guillermo Grijalva (Mary Bega's full brother), and Aurelia Grijalva Orosco (Mary Bega's full sister) who were enrolled to the Gabrielino (Tongva) Tribe in the same 1928 approved Roll. AR at pp 0975-0980; 1067-72.

(ii) The BIA also failed to give any satisfactory explanation to its actions, including:

(1) Why it assigned a tribal affiliation to Mary Bega that is different from her full siblings, where Mary Bega's own sworn attestation only stated her tribe was "'Unknown Tribe' Riverside, County." AR at pp 1305; 2426-2432.

(2)  Why it chose to rely on Mary Bega's tribal affiliation alone which was not supported by substantial evidence itself, rather than the more substantial and extensive record showing Plaintiff's affiliation with the Gabrielino.

In sum, the BIA utterly failed to consider the extensive and well documented evidence in its own record which clearly show Plaintiff's affiliation with the Gabrielino (Tongva) Tribe and chose to rely on Mary Bega's tribal affiliation alone to justify its action.

The BIA's action (or inaction) is not supported by the rational reasoning required in administrative actions and must be reversed.

**E. This Court Shoulder Order the BIA to Issue a CDI to Plaintiff.**

There are two available remedies when a court determines that an agency failed to satisfy the procedural requirements of the APA: remand with vacatur or remand without vacatur. *Cal. Comties. Against Toxics v. U.S. E.P.A*., 688 F.3d 989, 992 (9th Cir. 2012); *see also 5 U.S.C. § 706(2)* (permitting a court to set aside agency action found to be unlawful). Whether an agency action should be vacated depends on the seriousness of the agency's errors and the disruptive consequence of an interim change. *See Cal. Comties*., 688 F.3d at 992; *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).

1    Here, the evidence indisputably shows that Plaintiff is entitled to a CDIB
2  acknowledging his tribal affiliation with the Gabrielino (Tongva) Tribe, and the BIA
3  should be ordered to issue such a CDIB to Plaintiff.

4    In the alternative, if the Court believes there are factual issues that need to be
5  resolved, it should remand the matter to the BIA to resolve the factual issues.

6  **V. CONCLUSION.**

7    For the aforementioned reasons, this Court should grant summary judgment in
8  favor of Plaintiff.

9                                           Respectfully submitted,

10                                          *Jiakun Lei*

Date:  November 1, 2021        */s/ Jiakun Lei*
11
                                           Jiakun Lei, CDLP LAW
12                                         Attorney for Plaintiff Emilio Reyes

Exhibit "1": Application Form for CDIB

OMB Control #1076-0153
Expiration Date: 03-31-2021

# BUREAU OF INDIAN AFFAIRS
## CERTIFICATE OF DEGREE OF INDIAN OR ALASKA NATIVE BLOOD
### INSTRUCTIONS

All portions of the Request for Certificate of Degree of Indian or Alaska Native Blood (CDIB) must be completed.  You must show your relationship to an enrolled member(s) of a federally recognized Indian tribe, whether it is through your birth mother or birth father, or both.  A federally recognized Indian tribe means an Indian or Alaska Native tribe, band, nation, pueblo, village, or community which appears on the list of recognized tribes published in the <u>Federal Register</u> by the Secretary of the Interior (25 U.S.C. 5131).

- Your degree of Indian blood is computed from lineal ancestors of Indian blood who were enrolled with a federally recognized Indian tribe or whose names appear on the designated base rolls of a federally recognized Indian tribe.

- You must give the maiden names of all women listed on the Request for CDIB, unless they were enrolled by their married names.

- A <u>Certified Copy of a Birth Certificate</u> is required to establish your relationship to a parent(s) enrolled with a federally recognized Indian tribe(s).

- If your parent is not enrolled with a federally recognized Indian tribe, a <u>Certified Copy of your parent's Birth or Death Certificate</u> is required to establish your parent's relationship to an enrolled member of a federally recognized Indian tribe(s).  If your grandparent(s) were not enrolled members of a federally recognized Indian tribe(s), a <u>Certified Copy of the Birth or Death Certificate for each grandparent</u> who was the child of an enrolled member of a federally recognized Indian tribe is required.

- Certified copies of Birth Certificates, Delayed Birth Certificates, and Death Certificates may be obtained from the State Department of Health or Bureau of Vital Statistics in the State where the person was born or died.

- In cases of adoption, the degree of Indian blood of the natural (birth) parent must be proven.

- **Please return your request and supporting documents to the Agency from whom you receive services.**  Incomplete requests will be returned with a request for further information. No action will be taken until the request is complete.

OMB Control  #1076-0153
Expiration Date: 03-31-2021
Page:  1

# BUREAU OF INDIAN AFFAIRS
## REQUEST FOR CERTIFICATE OF DEGREE OF INDIAN OR ALASKA NATIVE BLOOD

| Requester's Name (list all names by which Requester is or has been known): | Requester's  Address (including zip code): | | Date Received by Bureau of Indian Affairs: |
|---|---|---|---|
| Requester's Date of Birth:<br><br>Requester's Place of Birth:<br><br>Is Requester Adopted?<br>☐ Yes   ☐ No<br><br>Are Requester's Parents Adopted?<br>☐ Yes   ☐ No<br><br>   If Yes, list natural (birth)<br>   parents: (If known)<br><br>Tribe(s) with which Requester is enrolled:<br><br>Roll Nos: | Father's name:<br><br><br>Tribe:<br><br>Roll No.:<br><br>DOB:<br><br>Deceased  ☐ Yes   ☐ No<br>Year____<br><br><br><br>Mother's Name:<br><br><br>Tribe:<br><br>Roll No.:<br><br>DOB:<br><br>Deceased   ☐ Yes   ☐ No<br>Year____ | Paternal Grandfather's Name:<br><br><br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Paternal Grandmother's Name:<br><br><br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br><br><br>Maternal Grandfather's Name:<br><br><br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br><br><br>Maternal Grandmother's Name:<br><br><br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____ | Paternal Great  Grandfather's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Paternal Great Grandmother's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Paternal Great  Grandfather's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Paternal Great Grandmother's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Maternal Great Grandfather's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Maternal Great  Grandmother's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br><br>Maternal Great Grandfather's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____<br>Maternal Great Grandmother's Name:<br>Tribe:<br>Roll No:<br>DOB:              Deceased/Year____ |

**SUBMIT TO:  BIA AGENCY FROM WHOM YOU RECEIVE SERVICES**

**All BIA Agency Offices are listed in the Tribal Leaders Directory.**

**If you need help with locating the BIA AGENCY FROM WHOM YOU RECEIVE SERVICES,
please contact the Office of Indian Services at 202-513-7640.**

OMB Control #1076-0153
Expiration Date: 03-31-2021
Page: 2

## NOTICES AND CERTIFICATION

**NOTICE OF APPEAL RIGHTS**.

- When you receive your CDIB, you must review it for the correct name spelling, birth dates, and blood degrees.  If you believe that there are any mistakes on the CDIB, you must give a written request for corrections and provide supporting documentation to the issuing officer within 45 days (60 for Alaska tribes) of the date on the letter. If you fail to meet this deadline, appeal rights will be lost.  If the issuing officer decides that corrections are not needed, he or she will send a written determination with an explanation through certified mail to you and provide you with a copy of the appeals procedures.

- If you are denied a CDIB, you will be given a written determination with an explanation for the denial and a copy of the appeal procedures.

**PAPERWORK REDUCTION ACT STATEMENT**

The information collection requirement has been approved by the Office of Management and Budget under the Paperwork Reduction Act of 1995, 44 U.S.C. 3507(d), and assigned clearance number 1076-0153.  The agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Information is collected when individuals seek certification that they possess sufficient Indian blood to receive Federal program services based upon their status as American Indians or Alaska Natives.  The information collected will be used to assist in determining eligibility of the individual to receive Federal program services.  The information is supplied by a respondent to obtain a Certificate of Degree of Indian or Alaska Native Blood.  It is estimated that responding to the request will take an average of 1.5 hours to complete.  This includes the amount of time it takes to gather the information and fill out the form.  If you wish to make comments on the burden imposed by the form, please send them to the Information Collection Clearance Officer, Office of the Assistant Secretary - Indian Affairs, 1849 C Street, NW, Washington, DC 20240.  DO NOT SUBMIT YOUR CDIB REQUEST TO THIS ADDRESS; you should instead submit your CDIB request to the BIA Agency from whom you receive services.  Note: comments, names and addresses of commentators are available for public review during regular business hours.  If you wish us to withhold this information, you must state this prominently at the beginning of your comment.  We will honor your request to the extent allowable by law. In compliance with the Paperwork Reduction Act of 1995, as amended, the collection has been reviewed by the Office of Management and Budget, and assigned a number and expiration date.  The number and expiration date are at the top right corner of the form.

**PRIVACY ACT STATEMENT**.

This information is collected pursuant to the Privacy Act, 5 U.S.C. 552a.  Pursuant to system of record notice, Tribal Enrollment Reporting and Payment System, Interior/BIA-7, the Bureau of Indian Affairs will not disclose any record containing such information without the written consent of the respondent unless the requestor uses the information to perform assigned duties.  The primary use of this information is to certify that an individual possesses Indian blood to receive Federal program services.  Examples of others who may request the information are U.S.  Department of Justice or in a proceeding before a court or adjudicative body; Federal, state, local, or foreign law enforcement agency; Members of Congress; Department of Treasury to effect payment; a Federal agency for collecting a debt; and other Federal agencies to detect and eliminate fraud.

**NOTICE OF EFFECTS OF NON-DISCLOSURE**.

Disclosure of the information on this CDIB request is voluntary.  However, proof of Indian blood is required to receive Federal program services.

**NOTICE OF STATEMENTS AND SUBMISSIONS**.

Falsification or misrepresentation of information provided on this request is punishable under Federal Law, 18 U.S.C.  1001. Conviction may result in a fine and/or imprisonment of not more than 5 years.

---

I request a CDIB, and certify that I have read the instructions, and above notices about my request for a CDIB.  I further certify that the information which I have provided with this request to the Bureau of Indian Affairs is true and correct.

_____     _____
(Requester's signature)                                                                      (date)

---

**SUBMIT TO:  BIA AGENCY FROM WHOM YOU RECEIVE SERVICES**

# APPENDIX OF OTHER AUTHORITIES



**Job Number:** 156515918

## Document (1)

1. _93 Interior Dec. 13_

   **Client/Matter:** -None-

   **Search Terms:** certificate indian blood

   **Search Type:** Natural Language

   **Narrowed by:**

   | **Content Type** | **Narrowed by** |
   |---|---|
   | Administrative Materials | Jurisdiction: U.S. Federal; Practice Areas & Topics: Administrative Law |



## *93 Interior Dec. 13; 1986 I.D. LEXIS 3; 14 IBIA 3*

Department of the Interior

January 31, 1986, Decided

IBIA 84-41-A

*Department of Interior Board of Indian Appeals*          *Decisions*

**Reporter**
93 Interior Dec. 13 *; 1986 I.D. LEXIS 3 **; 14 IBIA 3 ***

# MORGAN UNDERWOOD, SR. v. DEPUTY ASS'T SECRETARY -- *INDIAN* AFFAIRS (OPERATIONS)

## Core Terms

*blood*, enrollment, *indian*, *certificate*, quantum, eligibility, issuance, manual, delegate, tribal, tribe, birth *certificate*, evidentiary, memorandum, promulgate, register, area director, discretionary, card-size, notice, card, motion to dismiss, pertinent part, guideline, paternity, birth

## Headnotes

 **[**1]**

 **[*13]**  1.  Indians: *Blood* Quantum

The Board of *Indian* Appeals has jurisdiction to review decisions by the Bureau of *Indian* Affairs concerning applications for *certificates* of degree of *Indian blood*.

 **[*14]**  2.  Administrative Procedure: Administrative Review -- Appeals -- Board of *Indian* Appeals: Jurisdiction -- Bureau of *Indian* Affairs: Administrative Appeals: Generally

The characterization of a decision rendered by the Deputy Assistant Secretary -- *Indian* Affairs (Operations) as discretionary is a legal conclusion subject to review by the Board of *Indian* Appeals.

3.  Indians: *Blood* Quantum -- Regulations: Publication

The procedures followed by the Bureau of *Indian* Affairs in determining an individual's *Indian blood* quantum are rules within the meaning of 5 U.S.C. § 551(4) (1982) **[***4]** and are required by 5 U.S.C. § 552 (1982) to be published in the *Federal Register*.

4.  Administrative Procedure: Rulemaking -- Indians: *Blood* Quantum -- Regulations: Publication

Under 5 U.S.C. § 552(a)(1) (1982) and the Supreme Court's holding in *Morton* v. *Ruiz,* 415 U.S. 199 (1974), an individual may not be adversely affected by a rule required to be published in the **[**2]** *Federal Register* that is not so published.

## Counsel

APPEARANCES:

Judy I. Lewis, Esq., Oklahoma City, Oklahoma, for appellant;

Scott Keep, Esq., Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., for appellee.

Counsel to the Board: Kathryn A. Lynn.

## Action

 **[\*\*\*3]** Appeal from a decision of the Deputy Assistant Secretary -- **_Indian_** Affairs (Operations) refusing to issue a **_certificate_** of degree of **_Indian blood_** based upon the **_blood_** quantum of the individuandal's alleged father. Reversed.

**Opinion By:** MUSKRAT

## Opinion

OPINION BY ADMINISTRATIVE JUDGE MUSKRAT

INTERIOR BOARD OF **_INDIAN_** APPEALS

On July 16, 1984, the Board of **_Indian_** Appeals (Board) received a notice of appeal from Morgan Underwood, Sr. (appellant).  Appellant sought review of a May 14, 1984, decision of the Deputy Assistant Secretary -- **_Indian_** Affairs (Operations) (appellee) refusing to issue him a **_certificate_** of degree of **_Indian blood_** (CDIB) based upon the **_blood_** quantum  of his alleged father, William Underwood.  This refusal was inconsistent with a May 13, 1975, decision of the Ardmore Agency, Bureau of **_Indian_** Affairs (BIA, agency), which had issued appellant a CDIB showing him to be 4/4 Chickasaw, based upon the **_blood_** quantum  of his mother **[\*\*3]**  and William Underwood. Appellee moved to dismiss the appeal.  For the reasons discussed below, the Board denies the motions to dismiss and reverses the decision.

Background

 **[\*\*\*5]** Appellant  was  born  on  May  31,  1907,  in  Marshall  County,  Oklahoma.   His  birth   apparently  was  not registered with the State.  Appellant's mother was Bettie Sealy Burris, a 4/4 degree Chickasaw with enrollment  No. [Redated Original].  Appellant states that his father was William Underwood, also a 4/4 degree Chickasaw with enrollment  No. [Redacted Original] .  There is no dispute that both appellant's mother and William Underwood were full-**_blood_** Chickasaw.  Appellant's mother died in 1955; William Underwood died in 1936.

In 1964 appellant applied for an Oklahoma Delayed  **_Certificate_** of Birth.  The application and supporting documentation were found  **[\*15]**  sufficient by the Oklahoma State Bureau of Vital Statistics under procedures set

93 Interior Dec. 13, *15; 1986 I.D. LEXIS 3, **3; 14 IBIA 3, ***5

forth in _63 Okla. Stat. § 1-313_ (1963) [1] and regulations implementing that statute. A delayed birth **_certificate_**, showing appellant's father to be William Underwood, was issued on March 24, 1964.

**[**4]**

On May 13, 1975, appellant and his son and grandchildren received CDIBs from the agency. Appellant's CDIB showed him to be 4/4 degree Chickasaw.

**[***6]** In 1983, the **_Indian_** Health Service in Lawton, Oklahoma, advised appellant that BIA was issuing CDIBs on a card rather than on the 8-1/2-by-11-inch **_certificate_** he had received in 1975. Appellant asked BIA for a card-size CDIB. Before issuing the smaller **_certificate_**, the agency reviewed appellant's records and determined it would not consider the **_blood_** quantum of William Underwood in issuing the card-size CDIB. In a December 20, 1983, letter concerning this matter, the agency Superintendent stated at page 1:

We have reviewed the records available in this office and find that there is no judicial determination of heirs of record to establish Morgan Underwood as a son of William Underwood, Chickasaw 1071. The Departmental Proof of Death and Heirship on file for William Underwood, Chickasaw 1071, shows he was married only one time to Mary Underwood, Chickasaw IW-355, until his death on October 18, 1936. There were no children listed. The Decree of Heirship for Bettie Burris, Chickasaw 2836, lists Morgan Underwood as her son, but does **[**5]** not list William Underwood as his father or as her husband. [Italics in original.]

Appellant appealed this decision to the Muskogee Area Director, BIA, who forwarded the appeal to appellee without decision. On May 14, 1984, appellee issued a decision affirming the action taken by the agency. Appellee stated at pages 1-2 of his decision:

You base your appeal on several points. You contend that Morgan's parentage as shown on the delayed **_certificate_** of birth is proof of the facts contained therein; that the Departmental proof of death and heirship of William Underwood is not conclusive proof that William Underwood was not Morgan's father; that the county court of Marshall County made findings of fact and conclusions of law that Morgan Underwood is a full **_blood_** **[***7]** Chickasaw; that the 1975 **_certificate_** of degree of **_Indian blood_** issued by the Ardmore Agency Superintendent is res judicata on the issue of **_blood_** quantum; principles of estoppel preclude the Superintendent from now changing his 1975 decision; and that the unwarranted change in position of the federal government without notice and opportunity to be heard affected substantial rights and privileges of the appellant.

While there **[**6]** is legislation which provides that the **_blood_** degree of persons named on the final rolls of the Five Civilized Tribes cannot be changed, there is no authority of law **[*16]** which prevents the correction of **_blood_** degree for descendants of final enrollees where error has been established. The **_certificates_** of degree of **_Indian blood_** are Bureau of **_Indian_** Affairs documents issued to identify eligible recipients of Bureau services and, as such, are not directly affected by state or county laws. The Five Civilized Tribes, through their constitutions, require that applicants for enrollment submit **_certificates_** of degree of **_Indian blood_** as proof of their descent from final enrollees.

---

[1] Sec. 1-313 states in pertinent part

"(a) When the birth of a person born in this state has not been registered, a **_certificate_** may be filed in accordance with regulations of the State Board of Health. Such **_certificate_** shall be registered subject to such evidentiary requirements as the Board shall by regulation prescribe, to substantiate the alleged facts of birth.

* * *

"(c) A summary statement of the evidence submitted in support of the delayed registration shall be endorsed on the **_certificate_**.

"(d) When an applicant does not submit the minimum documentation required in the regulations for delayed registration, or when the State Commissioner of Health finds reason to question the validity or adequacy of the documentary evidence, the Commissioner shall not register the delayed **_certificate_** and shall advise the applicant of the reasons for his action."

* * *

Based on the foregoing [discussion of the marital relations of William Underwood and Bettie Burris], we have concluded that Morgan Underwood was an illegitimate child of Bettie Burris.  It has long been the policy of the Bureau that in determining the degree of _**Indian blood**_  of children born out of wedlock, the child may only be credited with _**Indian blood**_  derived from the mother UNLESS paternity  has been acknowledged by the father or determined by the courts.   The Bureau does not have the responsibility **[**7]**  or obligation to make legal determinations of paternity.  Only a court of competent jurisdiction has such authority.

We have concluded, therefore, that in Morgan Underwood's case, we can consider only _**Indian blood**_  derived from his mother, Bettie Burris, until such time as a court determination of paternity  has been made.  Your appeal, therefore, is denied.  This decision is based on the exercise of authority delegated to me by the Secretary of the Interior and is final for the Department.  [Italics in original.]

Appellant's appeal to the Board from this decision was received on July 16, 1984.  In addition to the briefs filed by both parties, appellee filed a motion to dismiss  the appeal, arguing that the Board lacks jurisdiction over the matter.

 **[***8]** Jurisdiction

The parties and the administrative record in this case raise several logically disparate issues.  These issues will not necessarily be addressed in the order in which they were raised.

Appellee challenges the Board's jurisdiction to hear this case on three grounds: (1) CDIB appeals are in the nature of enrollment  appeals; (2) the underlying issue is a discretionary  policy decision; and (3) there is no right to appeal this  **[**8]**  decision under 25 CFR Part 2.

Appellee first argues that the Board lacks jurisdiction over this case because it is "in the nature of an enrollment appeal." At page 3 of his answer brief, appellee states:

In the absence of any regulations  requiring or defining the issuance  of CDIBs, the Assistant Secretary has taken the position that the issuance  of them is in the nature of an enrollment  matter.  Although some of the Bureau's Area Offices have advised individuals that they had a right to appeal  the Area's decisions on CDIBs pursuant to 25 CFR Part 2, the Bureau's Central Office and the Assistant Secretary's Office have always treated appeals from decisions related to the issuance  of CDIBs as enrollment  appeals pursuant to 25 CFR Part 62.

The pragmatic justifications cited by appellee for treating appeals from CDIB decisions as enrollment  appeals are that the same type of genealogical research must be done in both cases; review of CDIB decisions is often lengthy because of the research requirements, and could easily extend beyond the time  **[***9]** periods set forth in 25 CFR Part 2; and enrollment  appeals could be recast as CDIB appeals in  **[*17order]**  to circumvent the Department's proscription **[**9]** against Board review of enrollment  disputes.

By regulation,  the Board does not have jurisdiction over enrollment  disputes.  Section 4.330(b)(1) of 43 CFR states: "Except as otherwise permitted by the Secretary, the Assistant Secretary for _**Indian**_  Affairs or the Commissioner of _**Indian**_  Affairs by special delegation or request, the Board shall not adjudicate * * * Tribal enrollment  disputes." See _Dahl v. Bureau of **Indian** Affairs, 10 IBIA 466 (1982)_. Special procedures for appealing tribal  enrollment  decisions are provided in 25 CFR Part 62.  Section 62.2 states the purpose of the regulations:

The regulations  in this Part 62 are for the purpose of establishing the procedure for filing appeals in conjunction with the rejection of any name from a roll of an _**Indian**_  tribe  when final approval thereof rests within the purview of the Secretary either because of provisions in tribal  constitutions or specific acts of Congress.  The regulations  are not to apply in those instances where the procedures for filing appeals by applicants rejected for tribal  membership are prescribed in tribal  documents.  [Italics added.]

Section 62.3(a) states in pertinent part: "Any person who has been rejected **[**10]** for enrollment  may file or have filed in his behalf an appeal from an adverse enrollment  action." (Italics added.) Part 62 provides for initial action by

93 Interior Dec. 13, *16; 1986 I.D. LEXIS 3, **10; 14 IBIA 3, ***9

superintendents  and area directors, with appeals from area directors' decisions going to the Commissioner of **Indian** Affairs for transmittal to the Secretary, whose decision is final and conclusive.  Section 62.9 provides **[***10]** that "[t]o facilitate the work of the [Area] Director, the Commissioner may issue special instructions not inconsistent with the regulations  in this Part 62."

Part 62 clearly applies by its own terms only to appeals from rejections of applications for tribal  enrollment.  The issuance  of CDIBs is thus not covered by the express language of Part 62.

Appellee contends that despite the express language of Part 62, CDIB appeals are treated as enrollment  appeals under Part 62 through a longstanding decision of the Assistant Secretary.  Appellee fails, however, to cite any written policy statement or delegation of authority by the Secretary or Assistant Secretary making CDIB appeals subject to the enrollment  disputes procedures of Part 62.  The only evidence presented on this argument is an affidavit signed by the Chief, **[**11]** Branch of Tribal  Enrollment  Services, BIA, stating the conclusion that CDIB appeals are in the nature of enrollment  appeals; a portion of a BIA instruction manual  dealing with CDIB determinations; and a copy of a 1983 decision in an unrelated CDIB case in which the Assistant Secretary states that his "determination is based on the exercise of authority delegated to [him] by the Secretary of the Interior and is final for the Department" (Exh. C, page 2, to appellee's answer brief).

Neither the Chief of the Branch of Tribal  Enrollment  Services nor the BIA instruction manual  does more than state a conclusion without legal support for that conclusion.  The Assistant Secretary's 1983 **[*18]** decision does not cite **[***11]** the regulation  or delegation of authority under which he was acting.  The Assistant Secretary, as a Secretarial-level official, has authority to issue final decisions for the Department that are generally not reviewable by the Board.  See, e.g., *Interim Ad Hoc Committee of the Karok Tribe v. Sacramento Area Director, 13 IBIA 76, 92 I.D. 46 (1985)*.  The fact that the Assistant Secretary stated his decision in a CDIB appeal was final for the Department does not, however, equate **[**12]** with a determination that finality attached because the decision involved a CDIB appeal that was in the nature of an enrollment  appeal under Part 62.

Furthermore, appellee's arguments as to why CDIB appeals must be treated as enrollment  appeals are unconvincing.  The fact that the same type of genealogical research must be done in CDIB appeals as in enrollment appeals does not make the purpose of doing the research and the uses of the result equivalent.  The time required for completing CDIB research can be allowed through a Board order granting a stay.  Finally, BIA and the Department's Solicitor's Office are quite capable of informing the Board if an enrollment  appeal were recast as a CDIB appeal in order to circumvent the finality of decisions under 25 CFR Part 62.

[1] Based on this discussion, the Board finds that although CDIB appeals have some features in common with enrollment  appeals, CDIB appeals are not encompassed by the explicit language of 25 CFR Part 62, and there is no regulation  or written policy statement equating CDIB appeals with enrollment  appeals.  Consequently, the Board holds that CDIB appeals are not subject to 25 CFR Part 62, and it is not precluded from **[**13]** reviewing CDIB appeals **[***12]** by *43 CFR 4.330(b)(1)*.  Appellee's motion to dismiss  this case for lack of jurisdiction on the grounds that CDIB appeals are in the nature of enrollment  appeals is denied. [2]

Appellee next argues the Board lacks jurisdiction to hear this appeal because the underlying issue concerns the degree of proof BIA requires in establishing the **_blood_** quantum of an illegitimate child, which is the subject of a longstanding BIA policy under which only the mother's **_blood_** quantum  is considered in the absence of proof of paternity.  Appellee contends that this policy decision is discretionary,  and that the Board consequently has no jurisdiction **[**14]** to revise or require amendment of the policy under *43 CFR 4.330(b)(2)*.

[2] The Board agrees it does not have jurisdiction over decisions committed to BIA's discretion.  Section 4.330(b)(2) of 43 CFR states: "Except as otherwise permitted by the Secretary, the Assistant Secretary for **Indian** Affairs or the Commissioner of **Indian** Affairs by special delegation or request, the Board shall not adjudicate: * * * matters

---

[2] The fact that CDIB appeals may have been treated as enrollment  appeals for a long period of time does not give validity to an erroneous interpretation of law.  "Error is not to be perpetuated simply because it has been once made, and wisdom is not to be rejected merely because it comes late." *Western Coal Traffic League v. United States, 694 F.2d 378, 391 (5th Cir. 1983)*.

decided by the Bureau of *Indian* Affairs through exercise of its **[\*19]** discretionary authority." The Board has, however, held that whether a BIA decision is properly characterized as discretionary is a question of law over which the Board has jurisdiction. See Wray v. Deputy Assistant Secretary -- *Indian Affairs (Operations), 12 IBIA 146*, **[\*\*\*13]** *91 I.D. 43 (1984)*, and cases cited therein. If after reviewing a particular case, the Board concludes that the decision is based upon an exercise of discretion, it will limit its opinion to the extent required to avoid trespassing on BIA's legitimate exercise of discretion. The initial allegation that a decision is discretionary, however, does not negate the Board's jurisdiction; that allegation is more akin to an affirmative defense. **[\*\*15]** [3]

Therefore, appellee's motion to dismiss this appeal for lack of jurisdiction on the grounds that the decision involves the exercise of discretion is also denied.

Finally, appellee argues the Board lacks jurisdiction because there is no right to appeal his decision under 25 CFR Part 2. Appeals to the Board from BIA administrative actions and decisions are a continuation of the internal BIA administrative review procedures begun in 25 CFR Part 2. See *43 CFR 4.330(a)(1)*. Appellee contends at pages 2-3 of his answer brief:

There is no statute or regulation or fundamental constitutional law which requires the issuance of CDIBs. CDIBs are granted for the convenience of the government, solely at the Assistant Secretary's **[\*\*16]** discretion, to facilitate its work in determining eligibility of persons for federal programs. There is no regulation or statute which requires the issuance of these *certificates* nor is there any statute or regulation which makes the eligibility for any benefits or programs dependent on the possession of such *certificates*. Thus, no right or privilege of the Appellant within the meaning of Part 2 has been violated and the regulations of Part 2 do not apply.

 **[\*\*\*14]** In the absence of any statute or regulation requiring the issuance of the CDIBs, the decision to issue such [a] *certificate* is a policy decision addressed to the Assistant Secretary's discretion.

According to appellee, because of the absence of regulations concerning CDIBs, their issuance is totally gratuitous and discretionary, and, therefore, not covered by 25 CFR Part 2, which conditions the right to appeal on the "violation of a right or privilege of the appellant. Such rights or privileges must be based upon fundamental constitutional law, Federal statutes, treaties, or upon Departmental regulations. " *25 CFR 2.2*. The fact of this appeal, which by definition asserts a violation of appellant's rights and/or privileges, thus **[\*\*17]** raises the issue of the relationship between legal rights/privileges and CDIBs, and whether the absence of regulations concerning CDIBs is legally permissible.

*Indian blood* quantum and its corollary, *Indian* status, are legal concepts from which individual rights and privileges arise. Many **[\*20]** Federal statutes refer to and grant special privileges based upon *Indian* status or degree of *Indian blood*. See, e.g., the *Indian* Reorganization Act, June 18, 1934, *48 Stat. 988*, *25 U.S.C. § 479* ("The term '*Indian*' * * * shall include all persons of *Indian* descent who are members of any recognized *Indian* tribe now under Federal jurisdiction, * * * and shall further include all other persons of one-half or more *Indian blood*" ); and the *Indian* Appropriations Act of 1918, Act of May 25, 1918, 40 Stat. 564, *25 U.S.C.§ 297* ("No appropriation, except appropriations made pursuant to treaties, shall be used to educate children of less than one-fourth *Indian blood* whose parents are citizens of the United **[\*\*\*15]** States and of the State wherein they live and where there are adequate free school facilities provided."). Other statutes apply to Indians without definition of the term, leaving such definition **[\*\*18]** to the agency. See, e.g., *25 U.S.C. §§ 13*, 44, 45, 46, and 47.

A cursory examination of 25 CFR Chapter I reveals that although for some purposes, BIA has defined "*Indian*" exclusively as a member of a Federally recognized *Indian* tribe, for many other purposes a certain percentage of *Indian blood* also qualifies a person as an *Indian*. See, e.g., *25 CFR 5.1* (*Indian* preference in employment); 25 CFR 20.1(n) (eligibility for Federal financial assistance and social services); 25 CFR 22.6 (care of *Indian* children

---

[3] The exercise of discretion with respect to the *blood* quantum of an illegitimate child may, however, be subject to limitations imposed by the Administrative Procedure Act (APA), *5 U.S.C. §§ 551*, 553 (1982). See discussion, infra. All citations to the United States Code are to the 1982 edition.

93 Interior Dec. 13, *20; 1986 I.D. LEXIS 3, **18; 14 IBIA 3, ***15

in contract schools); *25 CFR 26.1(g)* (employment assistance for adult Indians); *25 CFR 27.1(i)* (vocational training for adult Indians); 25 CFR 31.1(a) (enrollment in Federal *Indian* schools); *25 CFR 40.1* (eligibility for higher education loans, grants, and other assistance); *25 CFR 101.1(d)* (loans from the revolving loan fund); *25 CFR 103.1(d)* (loan guaranties, insurance, and interest subsidies for financing reservation economic enterprises and housing); *25 CFR 151.2(c)(3)* (acquisition of land in trust status); *25 CFR 256.2(e)(3)* (eligibility for the housing improvement program); and *25 CFR 286.1(f)* (***Indian*** business development program).

[***16] In his decision, appellee acknowledged [**19] that CDIBs are issued to identify eligible recipients of BIA services.  This case demonstrates that CDIBs are also used for eligibility purposes by the ***Indian*** Health Service.

A BIA determination of ***Indian blood*** quantum is a prerequisite for acceptable proof of degree of ***Indian blood***. BIA has chosen to memorialize its genealogic research through the issuance of a CDIB showing its determination of a person's degree of ***Indian blood***.  This CDIB is accepted as proof in determining eligibility or ineligibility for services and benefits available to Indians.  BIA's practice of issuing CDIBs is thus an integral part of the process by which legal rights and privileges of Indians arise. [4] An action or decision of BIA regarding CDIBs is, therefore, a proper subject for appeal to the Board.

[**20]

If the rights and privileges of Indians are dependent on the proper issuance of CDIBs, and no regulations exist for governing this practice, [*21] the question then becomes whether or not this practice is subject to the APA requirements for rulemaking.  An agency "rule" is defined in pertinent part in *5 U.S.C. § 551(4)* as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."

While no attempt precisely to define rulemaking can be wholly successful, the essence of its meaning is generally understood.  Rulemaking by an agency characteristically involves the promulgation of concrete proposals, declaring generally applicable policies binding upon the affected public generally, but not adjudicating the rights and obligations of the parties before it.  See 1 K. Davis, Administrative Law Treatise, § 5.01 (1958).  Furthermore, rules ordinarily look to the future and are applied [***17] prospectively only, whereas orders are directed retrospectively, typically applying law and policy to past facts.

*PBW Stock Exchange, Inc. v. Securities and Exchange Commission, 485 F.2d 718, 732 (3rd Cir. 1973)*, cert. denied, *416 U.S. 969 (1974)*. See also, *American Express Co. v. United States, 472 F.2d 1050, 1055 (C.C.P.A. 1973)* (inter alia, rulemaking "looks not to the evidentiary facts but to policy-making conclusions to be drawn from the facts").

Agencies sometimes use the term "guidelines, " rather than "rule," in describing certain pronouncements.

It is of no moment that, for reasons it has failed to articulate, the Commission has clad its promulgation in the cloak of guidelines rather than rules.  * * * [I]It is the impact and not the phrasing that matters.  Indeed, agencies often adopt policies having the status of rules without codifying them in regulations, guidelines, or in other formal formats.

*Western Coal Traffic League, supra, at 392* and 392 n.61. See also *Brown Express, Inc. v. United States, 607 F.2d 695 (5th Cir. 1979)*. In *American Trucking Associations, Inc. v. ICC, 659 F.2d 452, 463 (5th Cir. 1981)*, the court discussed the differences between rules and guidelines and the criteria for determining whether a statement labeled a guideline actually constitutes a rule within the meaning of *5 U.S.C. § 551(4)*: "A policy statement is in reality a binding norm [**22] (a rule) unless (1) it acts only prospectively, and (2) it 'genuinely leaves the agency

---

[4] It is possible that BIA determinations of Indian blood quantum provided to tribes for their enrollment decisions might be held by the courts to the same standards as such determinations for eligibility for Federal services.  Because the issue is not raised in this appeal and concerns enrollment disputes, the Board does not address this question.

93 Interior Dec. 13, *21; 1986 I.D. LEXIS 3, **22; 14 IBIA 3, ***17

and its decision-makers free to exercise discretion.'" (Quotation from *American Bus Association v. United States, 627 F.2d 525, 529 (D.C. Cir. 1980)*.)

 **[***18]** In this case, appellee has presented a BIA instruction manual  and a 1977 memorandum  from the Muskogee Area Director to the superintendents  of the agencies serving the Five Tribes  as evidence of BIA policy regarding ***blood*** quantum  determinations.  It is clear BIA intended its instruction manual  to be followed by all employees working with ***blood*** quantum  determinations.  The 1977 memorandum  was likewise intended to control agency operations with respect to ***blood*** quantum  determinations.  The language used in both documents is mandatory and sets evidentiary  standards for ***blood*** quantum  determinations.  Furthermore, the 1977 memorandum  operates **[*22]** retrospectively.  There is no evidence and no allegation that these standards were ever made known to the persons affected by them.

[3] The Board holds that, under the criteria established by the Federal courts for determining whether an agency policy statement is a "rule" subject to the provisions of the **[**23]** APA, BIA's standards for determining ***Indian blood*** quantum  are "rules." These rules were not, however, by appellee's admission, published in accordance with *5 U.S.C. § 553*, [5] as mandated by section 552. [6]

 **[**24]**

 **[***19]** In *Morton v. Ruiz, 415 U.S. 199 (1974)*, the Supreme Court reviewed the consequences stemming from the lack of published regulations governing  BIA's general assistance program.  The Court stated at pages 230-32:

Having found that the congressional appropriation  was intended to cover welfare services at least to those Indians residing "on or near" the reservation, it does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility  requirements in order to allocate the limited funds available to him for this purpose.  * * * Thus, if there were only enough funds appropriated to provide meaningfully for 10,000 needy ***Indian*** beneficiaries and the entire class of eligible beneficiaries numbered 20,000, it would be incumbent upon the BIA to develop an eligibility  standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation  without benefits.  But in such a case the agency must, at a minimum, let the standard be generally known so as to ensure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial **[**25]** of benefits to potential beneficiaries.

* * * The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.  In the area of ***Indian*** affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates at the BIA.  This agency power to make rules that affect substantial individual rights  and obligations carries with it the responsibility not only to remain consistent with the governing legislation, * * * but also to employ procedures that conform to the law.  * * * No matter how rational or consistent with congressional intent a particular decision might be, the determination of eligibility cannot be made on an ad hoc basis by the dispenser of the funds.

---

[5] Sec. 553 provides in pertinent part

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. * * *

"(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

[6] Sec. 552 states in pertinent part:

"(a)(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public * * *

"(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."

93 Interior Dec. 13, *22; 1986 I.D. LEXIS 3, **25; 14 IBIA 3, ***19

The Administrative Procedure Act  was adopted to provide, inter alia, that administrative policies affecting individual rights  and obligations be promulgated pursuant to certain **[\*\*\*20]** stated procedures so as to avoid the inherent arbitrary nature of unpublished ad hoc determinations.  [Footnotes **[\*\*26]** omitted.]

The Court went on to hold that procedures for providing assistance, published only in the BIA Manual,  were not effective to deny coverage to certain individuals.  The Court concluded at page 236:

 **[\*23]**  The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions.  See, e.g., *Seminole Nation v. United States, 316 U.S. 286, 296 (1942)*; *Board of County Comm'rs v. Seber, 318 U.S. 705 (1943)*.  Particularly here, where the BIA has continually represented to Congress, when seeking funds, that Indians living near reservations are within the service area, it is essential that the  legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with its own procedures, to say nothing of those of the Administrative Procedure Act.  The denial of benefits to these respondents under such circumstances is inconsistent with "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." *Seminole Nation v. United States,  316 U.S., at 296*; see  *Squire v. Capoeman, 351 U.S. 1 (1956)*.  Before benefits be denied to these otherwise entitled Indians, the BIA must first promulgate eligibility  requirements according to established procedures.

After the Ruiz decision, BIA promulgated regulations governing  financial assistance that are now found in 25 CFR Part 20.  In  *Allen v. Navajo Area Director, 10 IBIA 146, 89 I.D. 508 (1982)*, the Board was called upon to review the regulations  in Part 20.  Unfortunately, the Board was compelled to find that the regulations  were still insufficient to inform those persons affected by them of the eligibility  requirements.  Instead, BIA continued to rely on the BIA Manual  for all of the pertinent requirements, while providing only general statements in Part 20.

 **[\*\*\*21]** This case presents the same situation.  Accurate determinations of ***Indian blood*** quantum  are required for the proper and consistent implementation of Federal statutes and regulations  affecting the rights and privileges of Indians.  In issuing  CDIBs, BIA has assumed the responsibility for determining an individual's degree of ***Indian blood***.  [7]  The procedures and rules by which this determination is made, including  **[\*\*28]** the evidentiary standards employed, are known only by BIA, not by those persons affected.  Unlike the situations in Ruiz and Allen, BIA has not even seen fit to set forth these rules in the BIA Manual.  These are truly "hidden regulations, " available to and known by only the initiated few. [8]

 **[\*\*29]**

Based upon this discussion, the Board concludes that BIA's requirements relative to the issuance  of CDIBs are rules within the meaning of the APA and should have been published in accordance with  *5 U.S.C. §§ 552* and 553.  The Board rejects appellee's argument that appeals from CDIB determinations are not subject to 25 CFR Part 2 because CDIBs are not required to be issued by regulation,  when the reason they are not issued by regulation  is that BIA has failed to follow the mandates of both the BIA Manual  and the APA to publish  **[\*\*\*22]** rules of general

---

[7] Cf.Aleutian/Pribilof Islands Ass'n, Inc. v. Acting Deputy Assistant Secretary -- ***Indian*** *Affairs (Operations), 9 IBIA 254, 260, 89 I.D. 196, 199 (1982)*.  The Board there cited, inter alia, *United States v. Nixon, 418 U.S. 683, 694-96 (1974)*, and *Service v. Dulles, 354 U.S. 363, 388 (1957)*, for the proposition that when an agency adopts a rule that is not required by statute, but is clearly within the agency's discretion in implementing a statute, it is bound by the regulation  even though it imposes duties in excess of those required by the statute.

[8] A critical review of the BIA Manual  is set forth in the Final Report, American ***Indian*** Policy Review Commission, submitted to Congress on May 17, 1977.  See Vol. 1 at 278-79 under the heading "Hidden Regulations. "

Jiakun Lei

93 Interior Dec. 13, *23; 1986 I.D. LEXIS 3, **29; 14 IBIA 3, ***22

applicability.  See the discussion of the 1968  **[*24]**  introduction to the BIA Manual  and _25 U.S.C. § 553_ in _Ruiz, supra at 233-34_. [9]

Accordingly, the Board denies appellee's final motion to dismiss  based on the grounds that **[**30]** CDIB appeals are not subject to the provisions of 25 CFR Part 2.

Discussion and Conclusions

The Board therefore reaches the merits of appellant's appeal.  Appellant requested that BIA issue him a card-size CDIB to replace the larger _**certificate**_ he received in 1975.  Rather than merely issuing  the smaller CDIB, BIA, based upon the Muskogee Area Director's 1977 memorandum,  reviewed the 1975 determination of appellant's _**blood**_ quantum. As a result of this review, BIA determined that appellant's _**blood**_ quantum  should be changed from 4/4 to 1/2, because appellant was illegitimate and there had been no judicial determination of paternity.  In reaching its decision, BIA apparently gave no weight whatsoever to appellant's delayed  birth _**certificate**_.  In fact, in his initial brief to the Board, appellee went to considerable length to suggest that appellant falsified the _**certificate**_.

[4] The Board has held herein that BIA's rules regarding _**Indian blood**_ quantum  determinations for the purpose of issuing  CDIBs should have **[***23]** been published in accordance with _5 U.S.C. § 552_. Section 552(a)(1) provides the penalty for failure to publish such rules: "Except to the extent that a person has actual and **[**31]** timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." Accordingly, because the APA required the publication of BIA's rules regarding CDIB determinations and because the rules were not so published, appellant cannot be adversely affected by them.  In this case, therefore, appellant's degree of _**Indian blood**_ cannot be changed on the basis of the evidentiary  standards set forth in unwritten policy statements or the Muskogee Area Director's 1977 memorandum,  and he is thus entitled to receive a card-size  CDIB consistent with the initial 1975 determination.  See discussion, supra; Ruiz; and Allen.

Furthermore, even if the 1977 memorandum  could be used to establish requirements, BIA did not follow the procedures set forth in it.  The memorandum  states at page 2:

The issuing  of a plasticized card  for a CDIB has resulted in requests for such cards  by individuals who have previously received a CDIB on the old form.  Anyone who received a _**certificate**_ issued after January 1, 1975, can be issued a plasticized card.  Those issued before January 1,  **[**32]** 1975, must be reviewed in accordance with present standards before a card  can be issued.

Appellant's initial CDIB was issued on May 13, 1975, a date clearly after January 1, 1975.  Instead of being issued a plastic card  in  **[*25]** accordance with the Area Director's instructions, appellant's request was treated as **[***24]** if his initial CDIB had been issued before January 1, 1975.  The BIA thus failed to follow its own hidden regulations.

In addition, even if the Board were to hold that appellant could be denied a card-size  CDIB containing the same information as his original CDIB, appellee has failed to provide any credible reasons for not ascribing any weight to appellant's delayed  birth _**certificate**_.  Appellee's suggestion that appellant himself added information to the delayed birth _**certificate**_  is refuted by the information presented from the Oklahoma official having custody of the records. No other reason for ignoring the delayed  birth _**certificate**_  is given.  Under _63 Okla. Stat. 1-324(b)_:

A copy of a _**certificate**_  or any part thereof issued in accordance with subsection (a) of this section, certified to by the State Commissioner of Health or by a person designated by him for such **[**33]** purpose, shall be considered for all purposes the same as the original, and shall be prima facie evidence of the facts therein stated, provided that

---

[9] The necessity of publishedregulations governing  CDIB determinations and appeals is clearly demonstrated by appellee's own admission at page 3 of his answer brief that not even all BIA offices are aware of the procedures they should follow in CDIB appeals.

93 Interior Dec. 13, *25; 1986 I.D. LEXIS 3, **33; 14 IBIA 3, ***24

the evidentiary value of a _**certificate**_ or record filed more than one (1) year after the event * * * shall be determined by the judicial or administrative body or official before whom the _**certificate**_ is offered as evidence.

Appellant's delayed birth _**certificate**_ is, at least, some evidence of the information it contains. The value of the _**certificate**_ depends in part upon the nature of the evidence supporting the State's decision to issue a _**certificate**_ showing William Underwood to be appellant's father. The nature of the evidence and degree of support is based on the State regulations implementing _63 Okla. Stat. 1-313_. These regulations are not available to the Board.

 [***25] If the Board had found that BIA could change appellant's CDIB under these circumstances, it would have referred this case for an evidentiary hearing and recommended decision based in part on the weight that should be given to the information contained in his delayed birth _**certificate**_.

Therefore, pursuant to the authority delegated to the Board of _**Indian**_ Appeals by the **[**34]** Secretary of the Interior, _43 CFR 4.1_, the May 14, 1984, decision appealed from is reversed, and the Bureau of _**Indian**_ Affairs is ordered to issue appellant a card-size _**certificate**_ of degree of _**Indian blood**_ showing him to be 4/4 Chickasaw.

JERRY MUSKRAT

Administrative Judge

WE CONCUR:

BERNARD V. PARRETTE

Alternate Member

FRANKLIN D. ARNESS

Alternate Member

Department of Interior Board of _**Indian**_ Appeals          Decisions

---

**End of Document**