TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
DANIEL A. BECK (Cal Bar. No. 204496)
Assistant United States Attorney
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-2574
    Facsimile: (213) 894-7819
    E-mail: Daniel.Beck@usdoj.gov

Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EMILIO REYES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF THE INTERIOR; BUREAU OF INDIAN AFFAIRS; AMY DUTSCHKE, in her official capacity as Regional Director of the Bureau of Indian Affairs Pacific Regional Office, and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 5:18-cv-02128-GW-AGRx<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  November 22, 2021<br>Hearing Time:  8:30 a.m.<br>Courtroom:  9D<br><br>Hon. George H. Wu<br>United States District Judge |

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Defendants respectfully submit their brief in opposition to Plaintiff's motion for partial summary judgment ("MSJ") [Dkt. no. 139], and in support of the Defendants' opening brief ("DOB") [Dkt. no. 140] in this Administrative Procedure Act (APA) case.[1] As set forth in its opening brief, the BIA has demonstrated a "rational connection between the facts found and the conclusions made." Ursack Inc. v. Sierra Interagency Black Bear Group, 639 F.3d 949, 956 (9th Cir. 2011) (quoting Native Ecosystems Council v. U.S. Forest Service, 418 F.3d 953, 960 (9th Cir. 2005)). Plaintiff's MSJ fails to carry his burden to prove his APA claims, and judgment should be granted for the Defendants accordingly.

## II. ARGUMENT

### A. Plaintiff's Argument Regarding a "Void Regulation" is Defective, And Does Not Support Issuing Him A CDIB As Its Remedy Under The APA

Plaintiff first claims that the BIA was obligated to issue him a CDIB, rather than a Verification of Indian ancestry. Plaintiff's claim that the specific document type he received should have been a CDIB is independent of his claim that the BIA also erred in determining that his lineal ancestor Mary Bega's tribal affiliation—and by extension, his own tribal affiliation—is from the Diegueno, rather than the Gabrielino.

To support this CDIB claim, Plaintiff argues that the BIA "[r]elied on a Void

---

[1] Summary judgment procedure is generally appropriate for resolving an APA claim, based upon an administrative record. However, while summary judgment type briefing may be used, an APA claim is not actually decided by the standards that apply to a summary judgment motion, because in reviewing an agency decision the district court is not acting as a gatekeeper deciding whether there is a genuine dispute of fact for trial. See Klamath Siskiyou Wildlands Center v. Gerritsma, 962 F. Supp. 2d 1230, 1233 (D. Ore. 2013) (discussing the differences between a summary judgment motion and APA review). Rather the district court essentially functions like an appellate court, applying the standards for APA review of agency action to the administrative record. See DOB at p. 3 (APA standards). Plaintiff's MSJ also discusses the APA standard of review, at pp. 7-9.

Regulation and Acted Capriciously." MSJ at p. 10. Plaintiff's argument appears to be that (1) the BIA was obligated to issue formal regulations to govern its practice of issuing CDIBs; (2) the BIA did not do so; and (3) therefore the BIA should now issue Plaintiff a CDIB, instead of the Verification that the BIA issued him (AR 0004-5). Plaintiff cites the BIA's proposal of CDIB issuance rules back in the year 2000. See 65 FR 20775-01, 2000 WL 383822. He argues that the BIA then never thereafter issued a final rule on this subject, and contends that the proposed rule is thus a "void regulation."

   This CDIB claim has many defects, starting with the fact that Plaintiff did not raise it below, and there is no reviewable record of the agency having addressed it. It was not properly exhausted, and cannot be decided here now. Plaintiff argues that he has exhausted his administrative remedies (MSJ at p. 7), but that is only true of his claim for changing the BIA's determination of his tribal affiliation and blood degree.

   Even if the CDIB claim had been properly raised with the BIA below, however, the remedy for an asserted failure to finalize regulations would not be for a district court to step into the breach and require the agency to implement whatever specific regulatory policy the Plaintiff now requests. The BIA's proposed rule for CDIB issuance was not a change from an existing rule, but was rather the proposed promulgation of a formal rule where there was none in place. See 65 FR 20775-01.

   At most, Plaintiff would thus have pointed out a lack of final process in publishing CDIB regulations—process that would not aid the Plaintiff's claim here, since the agency, if this issue were to be remanded, would still retain discretion to finalize the publication of such regulations, consistent with its modern practice of issuing CDIBs only to members of federally recognized tribes. In other words, this is not a situation where an invalid new rule was *replacing* a valid existing rule. Even if there were some process deficiency in finalizing a formal rule, and even if Plaintiff had validly exhausted and proven such a claim, the remedy under the APA would be to remand that specific matter back for the agency to address and resolve the process issue. See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health and Human Servs., 673 F. App'x 164, 172 (3d

1  Cir. 2016) (reversing agency approval of state Medicaid plan amendment, and explaining
2  that the proper remedy is to remand for further agency deliberations); Florida Power &
3  Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not
4  support the agency action … the proper course, except in rare circumstances, is to
5  remand to the agency for additional investigation or explanation."). Under the APA, a
6  court may find an agency's action arbitrary and capricious, but the court is "not generally
7  empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its
8  own conclusions based on such an inquiry." I.N.S. v. Orlando Ventura, 537 U.S. 12, 16
9  (2002) (quoting Florida Power & Light, 470 U.S. at 744).

   In other words, there is a mismatch between (1) Plaintiff's argument about an
ostensible lack of sufficient regulation on the BIA's issuance of CDIBs and (2) his
requested remedy—which is not requiring the agency to finalize regulations, but rather
requiring the agency to issue him a CDIB. Exemplifying this problem, Plaintiff's brief
argues that "[a]s a corollary of this concession, the BIA would also lack the authority to
issue CDIBs '[i]n the absence of regulations.'" MSJ at p. 10 (quoting 25 CFR at 20776).
To the extent that Plaintiff now wants a CDIB, arguing that the BIA lacks legal authority
to issue any CDIBs at all would not support that relief.

   Furthermore, there is an express statutory exception to the § 552(a)(1) final
publication requirement, when actual notice is provided by other means. See 5 U.S.C. §
552(a)(1)(E). As the district court explained in Texas Alliance for Home Care Services
v. Sebelius, 811 F. Supp. 2d 76, 103-104 (D.D.C. 2011), attacking a rule for lack of final
publication under § 552(a) fails to state a claim if the plaintiff (a) had actual notice of the
rule; and it also fails when (b) there is an "absence of any adverse effect that plaintiffs
have suffered as a result off the purported non-publication." Here, the rules of CDIB
issuance were clearly explained and stated on the CDIB application itself. AR 2613-15.

   The BIA's modern standardized practice of CDIB issuance—which is consistent
with the rule it publicly proposed in 2000—is also entirely rational, and Plaintiff's MSJ
identifies nothing wrong with it. The purpose of issuing CDIBs is "to assist individuals

3

in establishing their eligibility for programs and services based upon their status as American Indians and/or Alaska Natives." U.S. v. Rainbow, 813 F.3d 1097, 1103 (8th Cir. 2016) (quoting 65 Fed. Reg. 20775-01). Issuing CDIBs to individuals who are *not* entitled to receive such federal program benefits would likely create confusion and error, since people might mistakenly think that a CDIB confers a right to the special legal benefits that may extend to members of federally recognized tribes. CDIBs are not just a sort of generalized federal affirmation of the Indian genetic ancestry of various citizens. Plaintiff's argument that the BIA had previously issued CDIBs in a more indiscriminate manner decades or more ago, before its standardized modern practice, is not a good argument for requiring that old practice to be resurrected now—and certainly does not carry his burden to prove that such a remedy is merited under the APA.[2]

      Indeed, while Plaintiff argues that in prior years the BIA has issued CDIBs to some individuals who were not members of federally recognized tribes (including persons affiliated with the Diegueno and the Gabrielino), the specific examples he submits—which were not in the Administrative Record—bear prominent stamps that distinguish them from normal CDIBs, so as to prevent the erroneous perception that these CDIBs convey standard legal rights on their bearer. See e.g. Emilio Reyes Decl.,

---

[2] Moreover, to reverse the BIA's CDIB issuance practices *generally* pending such a rule finalization would create chaos in BIA operations and in agency documentation, for no valid reason. Plaintiff does not here request such a generalized vacatur and legislation of a broad substitute rule, and it would not be appropriate to grant if he had. See e.g. Cal. Cmtys. Against Toxics, 688 F.3d at 994 (granting motion for remand without vacatur due to potential disruptive consequences); Cook Inletkeeper v. EPA, 400 F. App'x 239, 241 (9th Cir. 2010) (same); N. Coast Rivers Alliance v. United States Dep't of the Interior, No. 1:16–cv–00307–LJO–MJS, 2016 WL 8673038, at *12 (E.D. Cal. Dec. 15, 2016) (same); Am. Forest Res. Council v. Ashe, 946 F. Supp. 2d 1, 45-46 (D.D.C. 2013) (motion for voluntary remand without vacatur granted because, among other things, it is at least plausible that further explanation on remand could redress the rule's deficiencies); Wilderness Watch v. U.S. Fish and Wildlife Service, No. CV 07-1185-PHX-SRB, 2012 WL 12960832, at *8 (D. Ariz. May 11, 2012) (remand without vacatur is appropriate because the agency may be able to readily cure the defects in its explanation on remand).

Exh. A (CDIB, stating at bottom "NOTE: The San Gabriel tribe is not federally recognized as set forth in 25 CFR 83.6(b) and the above named individual, therefore, may not be eligible for Bureau of Indian Affairs services"); Exhs. B, C, D, F, G (accord). The same is true of the Diegueno CDIBs that Plaintiff submitted, which contain similar statements disclaiming the bearer's eligibility for services. See Reyes Decl., Exhs. E, K.

Finally, Plaintiff does not establish that the modern practice of distinguishing these two document types, as CDIBs and Verifications, has harmed him. As discussed in Defendants' opening brief (DOB pp. 17-21), it is rational and important for the BIA to distinguish individuals who descend from federally-recognized tribes, since a right to federal benefits and services generally hinges upon that political distinction. Here, Plaintiff obtained a Verification (AR 0004-5), which states the BIA's formal finding on his ancestry. Insofar as Plaintiff would prefer for that document to be called a "Certification" rather than a "Verification," and wants to make the agency use the exact same document form type, there is no rational ground for requiring the BIA to issue these documents in such an artificially indiscriminate manner.

### B. Plaintiff Fails To Carry His Burden To Prove That The BIA Committed A Clear Error Of Judgment In Determining That Mary Bega's Tribal Affiliation Was Most Likely Diegueno

To reverse an agency's factual finding under the APA, the Plaintiff must prove that the agency committed a "clear error of judgment." Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989) (citation omitted). In other words, he must prove that the agency did not demonstrate a "rational connection between the facts found and the conclusions made." Ursack Inc., supra, 639 F.3d at 956. Plaintiff's MSJ fails to carry that burden. The BIA's April 23, 2018, decision declining to change the Plaintiff's tribal affiliation by changing the tribal affiliation of his great-great grandmother Mary Bega[3] is

---

[3] Plaintiff's MSJ does not appear to contest the BIA's determination of the specific degree of Indian blood for Mary Bega, and it is unclear how he could have done so. Rather he more narrowly contests the determination of tribal affiliation for Mary Bega.

1   supported by the Administrative Record. AR 2375-77.

2         As an overarching matter, which Defendant's opening brief discussed, the mass of
3   historical documents potentially bearing on the tribal affiliation of a person's distant
4   ancestor are often very complex and conflicting. Individuals are often uncertain about
5   which tribe their ancestors were affiliated with, and different family members may
6   frequently come up with very different contentions or speculations at different times. In
7   response to an individual's request for determination of Indian ancestry relative to a
8   given ancestor, however, the BIA has to exercise its judgment and expertise to formulate
9   a determination of tribal affiliation based upon what it views as the most reliable types of
10  historical documentation, weighing them.

11        When Plaintiff first requested a BIA determination of his Indian descent in
12  January of 2013, he wrote that his father's lineage "shows linkage to Gabrielino and
13  Diegueño Tribe." AR 0001. Plaintiff's attempt to argue that the records are unequivocal,
14  such that the BIA's finding must be reversed under the APA, fails to carry his burden.

15        As discussed in the Defendant's opening brief (DOB, pp. 10-13), the BIA
16  considered extensive historical documentation in responding to Plaintiff's request, and
17  determined that the tribal affiliation of his lineal ancestor Mary Bega was most likely
18  Diegueno. In doing so, the BIA gave the most significant weight to the 1928 California
19  Roll and Mary Bega's application for that 1928 Roll. That central documentation was
20  most consistent with Diegueno ancestry, since she stated that her tribal affiliation was
21  unknown, but her mother was born in "San Diego, California" and her father was born in
22  "Sonora, Mexico." AR0048, 2428. Her application stated that her mother was living on
23  June 1, 1852, in San Diego, California (Question 20). AR 2429.

24        Contesting the BIA's decision, Plaintiff cited to the 1928 California Roll
25  applications of two collateral relatives, Guillermo Grijalva (Mary Bega's brother) and
26  Aurelia Orosco (Mary Bega's sister). AR 0975-0980, 1067-1072. Plaintiff argued that
27  these documents from the BIA's files demonstrated that Mary Bega's tribal affiliation
28  should instead be classified as Gabrielino, because her brother and sister had identified

their tribe/band as "Mission, San Gabriel" in their 1928 Roll applications. Yet these applications gave two different locations for the birthplace of Mary Bega's mother, with Guillermo Grijalva stating that it was in Santa Barbara (AR 1695) and Aurelia (Grijalva) Orosco stating that her birthplace was in San Bernardino County. AR 1704. Her husband's 1928 application identified Aurelia (Grijalva) Orosco as Mexican. AR 2376. There was not a consensus; the submitted collateral relative documents were conflicting.

The BIA's letter further noted that the only other document it had located bearing on the tribal affiliation of Plaintiff's ancestor was a November 4, 1965 letter from the Associate Solicitor for Indian Affairs, which stated that Aurelia (Grijalva) Orosco is ½ San Gabriel. AR 2376. But as noted by the BIA's decision, that letter did not purport to determine the tribal affiliation in the family, but rather only addressed degree of Indian blood of the children and their eligibility for enrolling in the San Pasqual Band. Id.

Faced with conflicting information in the record, which is not unusual for matters of an ancestor's tribal affiliation, the BIA determined that on balance the documentary information for Mary Bega herself, as Plaintiff's lineal ancestor (he does not descend from Guillermo Grijalva or Aurelia Orosco), was most consistent with Diegueno tribal affiliation. AR 2375-77. In making that decision, the BIA's decision explained that it had considered the two collateral relative applications (contrary to Plaintiff's claims in the MSJ), but did not find them to be strong enough evidence to change that result. This was a rational conclusion from the agency's weighing of the overall evidence.

Plaintiff's MSJ maintains that the BIA did not consider the collateral relative documentation from Guillermo Grijalva or Aurelia Orosco at all, and that this was inconsistent with what it has done in other cases. See MSJ at p. 11. But that is not what the BIA's April 23, 2018 decision stated. It discussed the collateral relative information at considerable length, and it noted that it was conflicting. AR 2376. The evidence was weighed as a totality, although the documentation of direct lineal descent carried more weight. As the BIA's letter explained, it reviewed all of the records and materials in the case, but "the preponderance of the evidence does not support your request." AR 2377.

7

Plaintiff also claims that "[t]he only reason given by BIA for refusing to change Plaintiff's tribal affiliation from Diegueno to Gabrielino is because the Secretary of the Interior determined Mary Bega was a Diegueno Indian, and BIA does not have the legal authority to change *Mary Bega's identity as a Diegueno Indian.* AR at 1305." MSJ at p. 12. It is unclear where this claim comes from. The cite to AR 1305 is an unrelated document. The decision letter from the BIA's Regional Director clearly and expressly addressed Plaintiff's request to change his tribal affiliation through his ancestor Mary Bega, explains how that request was considered by the BIA based on an extensive documentary record, and explained why the request was not granted based on a preponderance of the evidence standard. AR 2375-77. The decision letter did not assert that the BIA lacked the power to decide the request.

Plaintiff claims that the Administrative Record shows that the BIA has recognized some of Mary Bega's descendants as Gabrielino. See MSJ at p. 11. Plaintiff attaches a variety of CDIBs and other documents to his declaration. These new CDIBs were not part of the Administrative Record below, and they cannot be considered as evidence that the BIA erred in making its determination.[4] But even if they could be considered here, they illustrate the evidentiary problem—tribal affiliation quickly becomes extremely complicated and conflicting when looking beyond a direct lineal ancestor. Conflicting claims of blood degrees and tribal affiliation are rife in the documents. For example, AR 0950 and AR 0543 are CDIBs of direct lineal Mary Bega descendants, issued in 1983

---

[4] Under the APA, judicial review is based upon the "full administrative record that was before [the agency] at the time [it] made [its] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Saunders,* 430 U.S. 99 (1977). Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973) (*per curiam*). *See also Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743 (1985); *Sanitary Bd. of City of Charleston v. Wheeler,* 918 F.3d 324, 334 (4th Cir. 2019); *Hill Dermaceuticals v. FDA,* 709 F.3d 44, 47 (D.C. Cir. 2013); *Safe Extensions, Inc. v. FAA,* 509 F.3d 593, 599 (D.C. Cir. 2007); *Inland Empire Pub. Lands Council v. Glickman,* 88 F.3d 697, 703 (9th Cir. 1996).

and 2004, which identified their ancestry as Diegueno. It may be possible to pick one particular subset of collateral relatives and make arguments one way or another for a preferred result. The BIA did not have the Reyes declaration's exhibits before it when making it decision—and so they cannot be held against that determination on APA review—but even if they had, an ancestor's tribal affiliation is not determined by the equivalent of a statistical vote amongst a subset of varied relatives. Collateral relatives and their descendants may have been quite mobile over recent decades—particularly for various groups that are not federally-recognized tribes—and their tribal affiliation may reflect various marriages or other intervening events. As such, a judgment as to their likely tribal affiliation does not necessarily bear on, much less serve as reliable evidence of, their distant relative's tribal affiliation.

In sum, Plaintiff fails to prove that there was a "clear error of judgment," such that the only possible determination of Mary Bega's tribal affiliation was Gabrielino. See Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989) (review standard). Plaintiff's APA claim should thus be denied.

### III. CONCLUSION

Judgment should be granted for the Defendants.

Dated: November 8, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section

   /s/ Daniel A. Beck
DANIEL A. BECK
Assistant United States Attorney

Attorneys for the Defendants